**Andrea D. Coit, OSB #002640**
acoit@eugenelaw.com
**Emily M. Perkins, OSB #222553**
eperkins@eugenelaw.com
HUTCHINSON COX
940 Willamette Street, Suite 400
P.O. Box 10886
Eugene, Oregon 97440
Telephone: (541) 686-9160
Facsimile: (541) 343-8693
Of Attorneys for Defendant City of Medford
Scott Clauson, Brian Sjothun, James Barringer,
Steven Furst, Michael Todd, Geoffrey Kirkpatrick,
Randal Jewell, and Trevor Arnold

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## MEDFORD DISTRICT

| | |
|---|---|
| APRIL FONSECA, aka APRIL EHRLICH, an individual,<br><br>              Plaintiff,<br><br>      v.<br><br>CITY OF MEDFORD, an Oregon municipal corporation, and JACKSON COUNTY, a subdivision of the State of Oregon, SCOTT CLAUSON, an individual, BRIAN SJOTHUN, an individual, JAMES BARRINGER, an individual, STEVEN FURST, an individual, MICHAEL TODD, an individual, GEOFFREY KIRKPATRICK, an individual, RANDAL JEWELL, an individual, TREVOR ARNOLD, an individual, and ANNA STOKES, an individual,<br><br>              Defendants. | Case No. 1:22-cv-01416-CL<br><br>**MOTION FOR SUMMARY JUDGMENT ON BEHALF OF CITY OF MEDFORD, SCOTT CLAUSON, BRIAN SJOTHUN, JAMES BARRINGER, STEVEN FURST, MICHAEL TODD, GEOFFREY KIRKPATRICK, RANDAL JEWELL, AND TREVOR ARNOLD**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

**Page**

I.  DEFENDANTS MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. PROC. 56 ........................................................................... 1

II.  STATEMENT OF MATERIAL FACTS ........................................................... 1

III.  STANDARD OF REVIEW ............................................................................. 7

IV.  LAW AND ARGUMENT ................................................................................ 7

    A.  Plaintiff Cannot Prove her 42 USC § 1983 Claims Against the Individual City Defendants ........................................................................ 7

        1.  Defendants Clauson, Sjothun, Kirkpatrick, Jewell and Arnold Must Be Dismissed From Direct Liability Claims .................................................... 8

        2.  Plaintiff Cannot Prove A Constitutional Violation Committed by Barringer, Furst or Todd ................................................. 9

            a.  No Fourth Amendment Violation .................................................... 9

            b.  No First Amendment Violation ................................................... 11

    B.  Plaintiff Cannot Prove her 42 U.S.C. § 1983 Claim Against the City of Medford ........................................................................ 16

    C.  Plaintiff Cannot Prove her Supervisory Liability Claims under 42 U.S.C. § 1983 ........................................................................ 17

    D.  All Defendants Are Entitled to Judgment on the 42 U.S.C. § 1983 Claims Based on Qualified Immunity .................................................. 18

    E.  Plaintiff Cannot Establish the Elements of a State Law Claim of False Arrest .... 20

    F.  Plaintiff Cannot Establish a Claim for Battery .................................................... 20

V.  CONCLUSION ................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. News & Info. Servs., Inc. v. Gore,*
  *No.* 12-CV-2186 BEN KSC, 2014 WL 4681936 (S.D. Cal. Sept. 18, 2014) .......................... 15

*Ashcroft v. al-Kidd,*
  563 U.S. 731, 741 (2011)............................................................................................. 19

*Ashcroft v. Iqbal,*
  556 U.S. 662, 676 (2009)............................................................................................... 8

*Ballard v. City of Albany,*
  221 Or. App. 630, 640–41 (2008).............................................................................. 20

*Belsito Commc'ns, Inc. v. New Hampshire State Trooper James Decker,*
  No. 10-CV-450-SM, 2016 WL 141664, at *8 (D.N.H. Jan. 12, 2016), *aff'd sub nom.*
  *Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13 (1st Cir. 2016) ........................................ 14, 15

*Branzburg v. Hayes,*
  408 U.S. 665, 682 (1972)........................................................................... 12, 13, 14, 17

*California First Amend. Coal. v. Calderon,*
  150 F.3d 976, 981 (9th Cir. 1998) ............................................................................. 13

*Chavez v. City of Oakland,*
  No. C 08-04015 CRB, 2009 WL 1537875 (N.D. Cal. June 2, 2009), aff'd, 414 F. App'x 939
  (9th Cir. 2011)............................................................................................................. 13

*Chimel v. California,*
  395 U.S. 752 (1969)..................................................................................................... 10

*Davis v. United States,*
  131 S.Ct. 2419, 2423, (2011) ....................................................................................... 9

*Gigler v. Klamath Falls,*
  21 Or. App. 753, 763 (1975)....................................................................................... 20

*Houchins v. KQED, Inc.,*
  438 U.S. 1 (1978)................................................................................................... 12, 13

*Lindke v. Freed,*
  601 U.S. 187, 188 (2024).............................................................................................. 8

*Miller v. Columbia Cnty.,*
  282 Or. App. 348, 353–54 (2016)............................................................................... 20

*Monell v. Dept. of Social Services of New York City,*
  436 U.S. 658 (1978).............................................................................................. 16, 17

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ................................................................................................ 18

*Polanco v. Diaz*,
  76 F.4th 918, 925 (9th Cir. 2023) (*quoting Ballou v. McElvain*, 29 F.4th 413, 421
  (9th Cir. 2022)) ....................................................................................................... 18

*Rich v. Cooper*,
  234 Or. 300, 309 (1963) .......................................................................................... 20

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555, 586 n.2 (1980) ................................................................................... 13

*Rico v. Ducart*,
  980 F.3d 1292 (9th Cir. 2020) ................................................................................. 19

*Sandoval v. Cnty. of San Diego*,
  985 F.3d 657, 665 (9th Cir. 2021), *cert. denied* 142 S. Ct. 711 (2021) ...................... 7

*Saucier v. Katz*,
  533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) .............. 18

*See Beck v. Ohio*,
  379 U.S. 89, 91 (1964) ............................................................................................... 9

*Smith v. Agdeppa*,
  81 F.4th 994, 1001 (9th Cir. 2023) (*quoting Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (per
  curiam)) ................................................................................................................... 18

*Starr v. Baca*,
  652 F.3d 1202, 1205–06 (9th Cir. 2011) ................................................................. 17

*Walthers v. Gossett*,
  148 Or. App. 548, 552 (1997) .................................................................................. 20

*Zemel v. Rusk*,
  381 U.S. 1 (1965) ..................................................................................................... 13

**Other Authorities**

Medford City Charter (MCC) § 18(3)(e) ....................................................................... 9

Medford City Charter § 18(3)(e) .................................................................................. 2

Medford Municipal Code (MMC) § 5.250 ..................................................................... 9

**Rules**

Fed. R. Civ. P. 56 .................................................................................................... 1, 7

## CERTIFICATE OF COMPLIANCE WITH LR 7-1

The undersigned attorney certifies, in compliance with LR 7-1, that the parties made a good faith effort through a telephone conference to resolve the issues raised by these motions but have been unable to resolve them.

## I.    DEFENDANTS MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. PROC. 56

Defendants City of Medford, Scott Clauson, Brian Sjothun, James Barringer, Steven Furst, Michael Todd, Geoffrey Kirkpatrick, Randal Jewell, and Trevor Arnold (hereafter collectively "City Defendants") move for judgment as a matter of law under Fed. R. Civ. P. 56 against all claims asserted by Plaintiff against them.  As is set forth below, the undisputed material facts show that Plaintiff cannot prove her claims against the City Defendants as a matter of law.

This Motion is supported by the Court's file, the following points and authorities, and the Declarations of Trevor Arnold ("Arnold Dec."), and Andrea D. Coit ("Coit Dec."), with their attached exhibits, filed herewith.

## II.    STATEMENT OF MATERIAL FACTS

City Defendants are the City of Medford, its then-City Manager and various members of its police force.  Plaintiff is a reporter who, at the time of her arrest at issue in this case, worked for Jefferson Public Radio.  *See* Complaint.

In September 2020, a relatively large number of people were camping in Hawthorne Park, a municipal park in the heart of downtown Medford, Oregon.  A number of the campers were believed to be from out of the area, being called to the encampment through social media. Arnold Dec., ¶ 3, Ex. 1.  As the encampment grew to an approximate of 200 people, the City of Medford received an increasing number of complaints from concerned citizens.  Reports were received that the park was unsafe for use by the public.  There were reports of open drug use, property destruction, human waste and violence.  By the time the City decided it needed to close the park and remove the illegal campsites, an estimated 100 complaints regarding the park had

been received.  Arnold Dec., ¶ 4.  Calls for police response to the park increased from 29 during the period of August 10, 2020 through August 21, 2020, to 73 for the period of September 10, 2020 through September 21, 2020.  Arnold Dec., ¶ 5, Ex. 2.

By September 14, 2020, the Medford City Council, the Medford Chief of Police, the City Manager, Defendant Trevor Arnold and other members of the Livability Team had decided that the people illegally camping in Hawthorne Park and their campsites needed to be removed.  At the time relevant, Defendant Trevor Arnold was the Lieutenant of the Community Engagement Division for the City of Medford police department.  Arnold Dec., ¶ 6.  The Community Engagement Division is a section of the police department that covers the department's code enforcement division, livability team, the school resource program, the community service officer program, traffic, volunteers and cultural outreach. As such, he was tasked with the job of removing the illegal campers from Hawthorne Park and making it safe and available for the City's parks department to clean it.  He was also the point person for media relations regarding the City's plan for vacating the illegal campers from Hawthorne Park.  *Id.*

On September 18, 2020, City Manager Sjothun issued an order pursuant to City of Medford City Charter § 18(3)(e)[1] for the closure of Hawthorne Park in Medford, Oregon, for 48 hours, commencing on September 21, 2020, at 8:00 a.m.  Complaint ¶ 10; Arnold Dec., ¶ 7, Ex. 3.  City Manager Sjothun delegated his authority to extend the closure order to the Medford Chief of Police or the Parks and Recreation Director if circumstances warranted an extension. *Id.*  Defendant Sjothun explained his decision to close the park as follows:

> There are nearly 100 tents set up in the park and I've deemed this
> an unauthorized urban campground.  There are a number of items
> that are going on in the park including: drug use, fighting,
> destruction of public property, garbage and human waste.

Arnold Dec., Ex. 4.

---

[1] The Medford City Charter can be accessed here: https://medford.municipal.codes/Charter.
Section 18(3)(e) states: Except as provided in Section 21 with respect to the jurisdiction of the
Board of Water Commissioners, the city manager shall supervise the operation of all public
utilities owned and operated by the city and shall have general supervision over all city property.

On September 18, 2020, an Operation Plan was issued by the City of Medford for the removal of illegal campsites and campers from Hawthorne Park and for its cleanup. Arnold Dec., ¶ 9, Ex. 5.  Defendant Arnold was identified in the Operation Plan as the Incident Commander for that operation.  *Id*.; Complaint ¶ 11.  A formal notice to vacate was posted before 8:00 a.m. on September 21, 2020, alerting the campers at Hawthorne Park that they had 24 hours to vacate Hawthorne Park or face arrest for trespass.  Arnold Dec., ¶ 10.

Also on September 21, 2020, the Livability Team coordinated with various local outreach groups to conduct a resource fair at Hawthorne Park, with the goal being to connect as many of the unhoused people camping at the park with available resources for shelter and other needs. Participating groups included Jackson County Mental Health, Rogue Retreat, Men's and Women's Gospel Mission, and La Clinica.  The campers were informed of available shelters throughout the Rogue Valley and transportation to those shelters was offered and utilized by individuals at the park.  At the end of the day on September 21, 2020, 34 people had connected with Rogue Retreat and two people were taken to the Expo.  A total of 36 additional people who were connected with and eligible to go to Rogue Retreat did not accept the service.  At the conclusion of the day on September 21, 2020, the City again reiterated that the current health and sanitary conditions of Hawthorne Park required immediate closure.  Approximately 75 people still remained in Hawthorne Park at that time and they were reminded that, pursuant to the notice posted, the park was closed and they had to vacate.  Arnold Dec., ¶ 11, Ex. 6.

The City of Medford New Media Relations Policy, Policy No. 346, applicable to the City of Medford Police Department on September 22, 2020, provides in part:

MEDIA ACCESS

> Authorized members of the media should be provided access to scenes of disasters, criminal investigations, emergencies and other law enforcement activities subject to the following conditions:
>
> (a) The media representative shall produce valid press credentials that shall be prominently displayed at all times while in areas otherwise closed to the public.

(b) Media representatives may be prevented from interfering with emergency operations and criminal investigations.

Arnold Dec., ¶ 12, Ex. 7.  The term "emergency operation" as used in Policy 346 is defined as an organized response to specific incidents that do or have the potential to threaten health, safety or property.  Arnold Dec., ¶ 12.  The planned closure and clearance of Hawthorne Park on September 22, 2020, was an emergency operation for purposes of Policy 346.  *Id*.

Plaintiff agrees that the planned clean-up of Hawthorne Park was an emergency police operation.  She testified in her deposition:

> Q.    Okay. I was reading the e-mails, and I think it was marked Exhibit 1, the one from, it was on a Saturday to Chief Clauson, I believe. You said you understood that MPD was clearing Hawthorne Park. What do you mean by that?
>
> A.    I think at the time, they called them street sweeps or camp sweeps, which is when they remove homeless campers from an area.
>
> Q.    Okay. I heard you say camp sweeps before; so that's the same kind of thing?
>
> A.    Uh-huh.
>
> Q.    Is that considered a, in your mind, is that considered like a law enforcement activity?
>
> A.    Yes.

Fonseca Depo 104:24-105:12.

The conditions of Hawthorne Park by September 22, 2020, posed a genuine threat to the health and safety of any member of the general public who wanted to use the park for its intended purpose while it was being occupied by the campers.  The campers had and continued to damage the public property at Hawthorne Park, including tearing the doors off the bathrooms, defecating in the public spaces, and damaging the trees, shrubbery and grass.  Arnold Dec., ¶ 13, Ex. 14 (photos).

Defendant Arnold also had significant concern that the clearance of the park may become volatile, both with the campers remaining in the park on September 22, 2020 and with the various protests groups that had been recruiting people to occupy the park.  Due to this latter

concern, the Medford Police Department made an effort to keep disclosure of the Operation Plan, specifically the date of the planned clearance, as limited as possible so as not to allow those actively recruiting campers to gather more people at the park before the clearance operation began, in an effort to avoid a volatile confrontation between officers and people who did not want to leave Hawthorne Park.  Arnold Dec., ¶ 14, Ex 8.

Plaintiff was also aware that protest organizers were active at Hawthorne Park.  She received a prior release of a September 21, 2020 press release issued by the organizers of the Hawthorne Park encampment intended to draw additional protestors to the park prior to it being cleared.  Arnold Dec., Ex. 9.  She testified regarding this issue as follows:

> A.   She [protest organizer Maig Tinnin] might have told me that they were going to send a press release letting people know about it [police sweep of campers at Hawthorne PArk
>
> Q.   Okay. So your understanding is that this is a press release from Maig Tinnin or the organizers?
>
> A.   Yeah, that's what it looks like.
>
>           * * *
>
> Q.   Okay. Did you encounter anyone that you, that you knew [in Hawthorne Park]?
>
> A.   I mean, Maig was there, and I believe Derek was there. And there were some other people who I had seen at other protests and things that I covered, but I don't remember their names.

Fonseca Depo 51:3-7; 57:9-14.

On September 22, 2020, the City of Medford Police Department arrived at Hawthorne Park around 8:00 a.m. and again announced to the campers and others in the park that Hawthorne Park was closed.  Arnold Dec., ¶ 16; Complaint ¶ 12.  Campers actively engaging in clean-up and removal of their belongings and those assisting campers in that clean-up and removal were permitted to remain in the park for the time required to accomplish the objective of cleaning up and moving out.  Representatives of the City of Medford (including police officers and probation officers) and representatives of resource agencies engaged in assisting the campers in their

transition to alternative locations were also permitted to remain in the park if they were assisting in the clean-up operation.  *Id.*

All other people were prohibited from entering the park during its closure on September 22, 2020.  Defendant Arnold informed his officers that the goal was to allow people the time to cooperate and leave the park after being told it was closed.  They wanted to allow people a chance to leave after being fully informed that they had no right to be in the closed location and that their continued presence would result in an arrest for trespass.  Arnold Dec., ¶ 17.

As the operation was considered by the City to be an emergency operation for purposes of Policy 346, members of the media acting in that capacity (as opposed to acting as a resource representative actively engaged in assisting the campers in transitioning out of the park) were excluded from the park during the term of its closure.  Arnold Dec., ¶ 18.  However, in an effort to minimize the impact on the media's news gathering resulting from the closure of the park during the operation, Defendant Arnold designated a specific location outside of the entrance to the park as a proposed media staging area.  He instructed his officers who encountered any representatives from the media to let them know they had to leave the park, but that they could relocate to this staging area, and he would be available to answer questions.  *Id.*

Defendant Arnold identified a location outside of the park that he thought would best allow the media to witness what was occurring in the park, and to approach and speak with campers as they left the entrance to the park.  Arnold Dec., ¶ 19.  The media did not have to locate themselves in the proposed staging area.  They could report from any location outside of the closed park.  *Id.* Representatives from other news organizations also responded to Hawthorne Park on September 22, 2020, including local news channels News 10 and News 5. Both of those reporters filmed the clearance operation from outside of the closed park, in the proposed media staging area, broadcasting the information on their respective Facebook Live accounts.  *Id.*

Plaintiff entered Hawthorne Park on September 22, 2020, despite it being closed to the public.  Complaint ¶ 13.  Plaintiff was not a camper in the park, she was not assisting campers in their clean-up and removal of personal items from the park, and she was not a representative of a

resource agency.  Plaintiff, rather, entered the park to report on the activities going on during its closure.  *Id.*

City of Medford police officers informed Plaintiff that Hawthorne Park was closed, that she was trespassing, and that she was required to leave the park.  Complaint ¶ 15; Fonseca Depo 59:23-25 ("At that point, you were told it was a closed, the park was closed, correct? A. Yes.").  Plaintiff twice unequivocally refused the police officers' instruction to leave Hawthorne Park.  She just shook her head repeatedly and said "no."  Arnold Dec., ¶ 20, Ex. 10. She informed the police officers that she did not have to leave because she was a reporter. Complaint ¶ 15; Arnold Dec., Ex. 11 (Video of Arrest of April Fonseca "Fonseca Video").

After telling the police officers that she would not leave the park, Plaintiff was informed by City of Medford police officers that she was under arrest for trespassing.  Arnold Dec., ¶ 21, Ex. 12.  Plaintiff struggled with the police officers as they worked to secure her hands into handcuffs.  Plaintiff yelled at the officers and demanded to be released, stating that they could not arrest her because she was a reporter doing her job.  Complaint ¶ 16; Fonseca Video. Medford police officers ultimately secured Plaintiff's hands into handcuffs.  She was thereafter transported and lodged into the Jackson County jail on charges of trespassing, resisting arrest and interfering with a police officer.  Complaint ¶ 17; Arnold Dec., ¶ 21, Ex. 13.

## III.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), summary judgment must be granted when, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021), *cert. denied* 142 S. Ct. 711 (2021).

## IV.    LAW AND ARGUMENT

### A.    Plaintiff Cannot Prove her 42 USC § 1983 Claims Against the Individual City Defendants

42 U.S.C. § 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives someone of a federal

constitutional or statutory right. *Lindke v. Freed*, 601 U.S. 187, 188 (2024). "Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

Plaintiff alleges in her First and Fourth Claims that each of the individual City Defendants engaged in conduct that violated both her First and her Fourth Amendment rights. Specifically, she alleges that each of the individual City Defendants violated her First Amendment right by arresting her and removing her from Hawthorne Park, thereby depriving her of her ability to do her job as a journalist (Complaint, ¶¶ 19-21), and that each of the individual City Defendants violated her Fourth Amendment right to be free of unreasonable searches and seizures by unlawfully arresting her and searching her person and possessions (Complaint ¶¶ 27-29).

### 1.    Defendants Clauson, Sjothun, Kirkpatrick, Jewell and Arnold Must Be Dismissed From Direct Liability Claims

As noted, Plaintiff's First and Fourth claims allege direct liability against all of the individually named City Defendants for unlawfully arresting her and removing her from Hawthrone Park in violation of her First and Fourth Amendment rights. Complaint ¶¶ 21, 29. However, Plaintiff alleges that only City Defendants Barringer, Furst and Todd were involved in her arrest. Complaint ¶¶ 15, 16 and 17.

For Defendant Clauson, Plaintiff alleges only that he was the Police Chief, and that he sent an email to the City Manager about a plan to clean up Hawthorne Park. Complaint ¶ 9. For Defendant Sjothun, Plaintiff alleges only that he was the City Manager and sent an email to others alerting them that he was closing Hawthorne Park on September 21, 2020. Complaint ¶ 10. For Defendant Kirkpatrick, Plaintiff alleges that he was a sergeant and was present in Hawthorne Park on September 22, 2020. Complaint ¶¶ 4, 14. For Defendant Jewell, Plaintiff alleges only that he was the Event Supervisor for the Hawthorne Park operation and that he was present in the park on September 22, 2020. Complaint ¶¶ 11, 14. For Defendant Arnold, Plaintiff alleges that he was

the Incident Commander for the Hawthorne Park operation and that he was present in the park on September 22, 2020.  Complaint ¶¶ 11, 14.

Neither in her complaint nor in her deposition did Plaintiff identify any participation by the aforementioned defendants in her arrest that set in motion, assisted with, caused, or contributed to her being arrested.  As that is the only conduct identified by Plaintiff in her lawsuit as being in contravention of her constitutional rights, she has failed to identify any conduct by Defendants Clauson, Sjothun, Kirkpatrick, Jewell or Arnold that violated her constitutional rights.  Under *Iqbal*, each of the foregoing individual defendants must be dismissed from Plaintiff's First and Fourth claims as a matter of law.

### 2.    Plaintiff Cannot Prove A Constitutional Violation Committed by Barringer, Furst or Todd

#### a.    No Fourth Amendment Violation

Under the Medford City Charter (MCC) § 18(3)(e), allowing him authority over all City property, the City Manager had the authority to issue a closure order covering Hawthorne Park, a City-owned property.  Defendant Sjothun issued that closure order on September 18, 2020, with an effective date of September 21, 2020, at 8:00 a.m. Arnold Dec., Ex. 3.  The park was closed to allow for removal of the illegal campsites and the clean-up of the park. Arnold Dec., ¶ 6.

The Medford Municipal Code (MMC) § 5.250 prohibits Trespass-Premises and states, "no person shall enter or remain unlawfully in or on the premises."  Under MMC § 5.240, a "premises" includes any building or property, whether publicly or privately owned, and the term "enter or remain unlawfully" includes failing to leave premises after being lawfully directed to do so by a person in charge or a person who has lawful control of premises through ownership, official position or other legal relationship.  Coit Dec., Ex. 2.

"The Fourth Amendment protects the right to be free from unreasonable searches and seizures." *Davis v. United States*, 131 S.Ct. 2419, 2423, (2011).  An arrest supported by probable cause is reasonable under the Fourth Amendment as a matter of law.  *See Beck v. Ohio*, 379 U.S. 89, 91 (1964) (Holding that probable cause to arrest exists when the facts and

circumstances within an officer's knowledge and of which he or she had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense.).

There is no dispute in this case that Hawthorne Park was closed to the public on September 22, 2020, and that Plaintiff was informed by law enforcement that she had to leave the park or she would be arrested for trespassing.  There is similarly no dispute that Plaintiff refused law enforcement's command to leave the park.  Upon that refusal, probable cause existed for her arrest.  *See* Arnold Dec., Ex. 12, Probable Cause Affidavit.

In *Chimel v. California*, 395 U.S. 752 (1969), the Court expressed the following rule for assessing the reasonableness of a search incident to arrest:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.... There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

*Id.*, at 762–763.

Plaintiff was arrested on probable cause that she had committed the crime of trespass. She and her belongings were searched incident to her arrest.  Plaintiff has testified that she has no reason to believe that her belongings were inappropriately searched.  She testified:

> Q.    Okay. Can you explain how they searched your belongings?
>
> A.    I'm not sure how they did.
>
>              * * *
>
> Q.    Do you remember your belongings being searched?
>
> A.    I don't remember, because I was arrested at that point.

Fonseca Depo 69:1-3, 16-19.

Plaintiff's seizure through arrest was lawful, and the subsequent search of her person and belongings made incident to her lawful arrest was within the bounds of the Fourth Amendment.[2]

### b.    No First Amendment Violation

Plaintiff has identified the First Amendment right at issue in this case as her alleged constitutional right to enter and remain in Hawthorne Park after it was closed to the public.  *See* Fonseca Depo at 67:9-11 ("I told them I was a reporter, and it was my right to be there, and they wouldn't grant me the opportunity to stay.").  Plaintiff asserts that as a reporter she has a greater First Amendment right than members of the public enjoy, allowing her to be anywhere she wants to be if she is there to actively engage in her occupation.  She testified:

> Q.    In your opinion, did Jayden [another person arrested for refusing to leave Hawthorne Park] have a right to be in that park?
>
> A.    I'm not sure. She wasn't a journalist.
>
> Q.    Okay.
>
> A.    So it's not really my place to say whether protesters are supposed to be in a certain location or not; that's the job, the cops' job. But for me, I can speak about journalists, and I believe it was my right to be there.

Fonseca Depo 118:17-25.  Following this logic, Plaintiff asserts that she could not be arrested for entering and remaining in the closed park during an active police operation because the First Amendment protected her right to be there.

Before reviewing what, if any, constitutional protection existed for what Plaintiff was doing on September 22, 2020, it is important to identify what Plaintiff was <u>not doing</u> on that date.  On September 22, 2020, Plaintiff was not attempting to publish information that she already had.  She was not reporting information to the public about a matter of public interest.  Thus, she is not in this Court challenging an overly broad time, place, manner restriction or a

---

[2] There is no allegation in this case that the Medford police conducted a search of the electronic content of Plaintiff's audio or video recording equipment.

prior restraint of her speech.  Rather, on September 22, 2020, Plaintiff was engaged in

information gathering.  She testified:

> Q.    So what sort of coverage were you planning on happening?
>
> A.    I was planning on being there to observe the camp sweep, and then report on it.
>
> Q.    And what do you mean by observe the camp sweep?
>
> A.    See what happened, record exchanges between people, and report on those events to the public.

Fonseca Depo 47:8-15.

When asked to clarify which part of the foregoing activities Plaintiff was intending to

accomplish while at Hawthorne Park, Plaintiff explained:

> Q.    Okay. And then you say, "I still plan on showing up early tomorrow [September 22, 2020] to monitor when MPD shows up."
>
> A.    Yes.
>
> Q.    Okay. So your plan was to show up on Tuesday and observe what was happening?
>
> A.    Exactly.

Fonseca Depo 52:4-10.  Thus, the constitutional protection Plaintiff claims to have had on

September 22, 2020, was to enter a location closed to the public, during a police operation, to

gather information that she may later report to the public.  She did not have such a right.

In *Houchins v. KQED, Inc*., 438 U.S. 1 (1978), the Supreme Court distinguished the

recognized First Amendment right to speak on information already obtained from an alleged

right to obtain information in the first instance.  The Court explained with regard to the latter that

while "there is an undoubted right to gather news, the right only extends to the gathering of news

from 'any source by means within the law.'" *Id.*, at 11, *quoting Branzburg v. Hayes*, 408 U.S.

665, 682 (1972).  *Houchins* explained that: "[a]ny reference in Supreme Court precedent to

constitutional entitlement of the public to information held by the government means no more

than that the government cannot restrain communication of whatever information is in fact

acquired.'" *Id.,* at 10; see also *Branzburg*, 408 U.S. at 684 ("The First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.").

*Houchins* teaches that "there is no constitutional basis for the claim that the First Amendment compels others – private persons or governments – to supply information" to reporters or others. *Id., at 11.* *Houchins* noted that nothing in the Court's prior holdings implied a special privilege of access to information, as distinguished from a right to publish information which has been obtained, explaining that "the First Amendment does not confer a right of access to news sources." *Id., see also Zemel v. Rusk,* 381 U.S. 1 (1965) ("The right to speak and publish (to which time, place, manner restrictions are strictly scrutinized) does not carry with it the unrestrained right to gather information."); and *California First Amend. Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998) ("the First Amendment to the United States Constitution affords no greater right to reporters to access locations or information that are not available to the public at large.").

With respect to a reporter's ability to access police operations, the courts have consistently found that "newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded." *Branzburg*, 408 at 684–85.  The First Amendment requires only that "the media's right of access be at least equal to that of the general public." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 586 n.2 (1980) (Brennan, J., concurring in judgment).  As an example, in *Chavez v. City of Oakland*, No. C 08-04015 CRB, 2009 WL 1537875 (N.D. Cal. June 2, 2009), aff'd, 414 F. App'x 939 (9th Cir. 2011), a reporter stopped at the scene of a traffic accident on the highway to take photographs of the accident for his employer-newspaper.  An officer on the scene told the plaintiff that he had to get in his car and leave because he was in a crime scene.  The plaintiff remained, asserting that he was a reporter and as such, was allowed document the accident for his newspaper.  After being arrested, the plaintiff brought a claim under 42 U.S.C. § 1983 asserting that he was arrested in retaliation for the exercise of his First Amendment rights.

Page 13 –  CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The court granted summary judgment for the defendant officer on their claim of qualified immunity, finding as the critical factor requiring dismissal on summary judgment the fact that the plaintiff had no First Amendment right to gather information at the scene of the accident. The court explained:

> Even assuming, as plaintiff contends, that the officers arrested plaintiff to prevent him from taking a photograph, he did not have a First Amendment right to take the photograph in the first place in the absence of evidence that the general public is allowed such access to accident sites, and this accident in particular. Plaintiff, however, does not offer any evidence that suggests that the general public had a right to exit their vehicles on the freeway and stand in the freeway to take photographs.

*Id.,* at *3. As such, the court held, the plaintiff could not establish a violation of a constitutional right. *Id.*

Similarly, in *Belsito Commc'ns, Inc. v. New Hampshire State Trooper James Decker*, No. 10-CV-450-SM, 2016 WL 141664, at *8 (D.N.H. Jan. 12, 2016), *aff'd sub nom. Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13 (1st Cir. 2016), the plaintiff claimed a violation of his First Amendment rights when police seized his camera. The plaintiff, a reporter, had responded to the scene of an accident dressed as a first responder to take pictures. The plaintiff entered what was identified as the "perimeter" of the accident scene to obtain his photographs. A law enforcement officer questioned the plaintiff regarding his authority to be in the accident perimeter and determined that he had no such authority and therefore had violated state law regarding unauthorized entry into an accident scene. While the officer did not arrest the plaintiff, he did seize his camera, purportedly to preserve evidence of the plaintiff's criminal activity. *Id.,* at *7-8. The plaintiff brought a claim under 42 U.S.C. § 1983, alleging his First Amendment rights were violated when his camera was seized, preventing him from taking photographs and engaging in his occupation as a reporter.

The court dismissed the plaintiff's claim, finding no First Amendment violation under the facts presented as a matter of law. The court, citing *Branzburg*, 408 U.S. at 682, explained that "[a]n important corollary to this interest [freedom of the press] in protecting the stock of public

information is that there is an undoubted right to gather news 'from any source *by means within the law*.'"  *Belsito* at *7, emphasis in original.  The court went on, explaining that:

> the highlighted language underscores an important fact that readily
> distinguishes this case from those upon which plaintiffs rely:
> plaintiff was not acting within the law while taking the
> photographs at issue. To the contrary, plaintiff was engaged in
> criminal conduct. He was within a restricted area without
> authorization, dressed in a way that falsely conveyed that he was a
> member of one of the responding emergency crews, and he was
> operating a vehicle with flashing red emergency lights—all in
> violation of New Hampshire law.

*Id.,* at *8.  As such, the plaintiff was not gathering news "by means within the law."  His efforts, to the contrary, were by means outside of what the law allows and therefore were not constitutionally protected.  *Id.*

Likewise, in *Am. News & Info. Servs., Inc. v. Gore, No*. 12-CV-2186 BEN KSC, 2014 WL 4681936 (S.D. Cal. Sept. 18, 2014), the district court granted a motion to dismiss the plaintiff's First Amendment claim that he had been arrested in retaliation for filming police activity "because the pleading reveal[ed] that the plaintiff was not filming in a location open to the public."  Because the filming occurred in a location that was not open to the public, the plaintiff had no First Amendment protection for his activity, regardless of his profession.  The court concluded that the facts in the operative pleading themselves proved that the plaintiff's arrest was lawful and any alleged impact the arrest had on his ability to film the police was not in violation of the First Amendment.  *Id.,* at *4-5.

The court explained:

> Playford alleges he was in an accident scene closed to the public, he
> objected to being told he could not be there, refused to leave, and was
> arrested. As this Court previously ruled, individuals, including
> members of the media, can be excluded from accident or crime scenes
> without violating the First Amendment. Based on the allegations of the
> SAC, the May 25, 2012 arrest occurred within an accident scene
> closed to the general public that Playford had no First Amendment
> right to be within. The allegations of his SAC indicate he objected to
> being excluded from the accident scene, refused to leave the accident
> scene and was arrested for it. Playford's First Amendment retaliation
> claim cannot succeed based on the May 25, 2012 arrest.

*Id.*, at *5, internal citations omitted.

In the present action, it is undisputed that Plaintiff entered a police operation in a location closed to the public to gather information.  When informed that the park was closed, Plaintiff refused to leave on the basis she had a special First Amendment right to be in the closed location to gather news.  By claiming she was immune from arrest for trespassing under these circumstances, Plaintiff is asserting that she had a First Amendment right of access to information greater than that of the general public.  But Plaintiff did not enjoy such a right at the time of her arrest.

Plaintiff was excluded from Hawthorne Park on September 22, 2020, just like every other member of the public who was not actively assisting in the effort of transitioning the campers to alternative locations.  She was subject to arrest for trespass, just like every other member of the public.  The individual City Defendants' lawful arrest of Plaintiff for trespass did not violate her First Amendment rights as a matter of law.

**B.      Plaintiff Cannot Prove her 42 U.S.C. § 1983 Claim Against the City of Medford**

A municipality may be held liable for the constitutional violations of its employees when the municipality's custom or policy led to the violation.  *Monell v. Dept. of Social Services of New York City,* 436 U.S. 658 (1978).  While the focus on a *Monell* claim is generally on the alleged policy or custom that led to the constitutional violation, there first must be a prerequisite showing of a constitutional violation.

Here, Plaintiff alleges that the City of Medford had a policy "that prevented her from observing and reporting on the events in Hawthorne Park on September 22, 2020." Complaint ¶ 23.  City Defendants dispute whether the decisions made regarding the Hawthorne Park clearance operation amounted to an official policy.  That dispute, however, is not material. The existence and implementation of the alleged policy did not result in a violation of Plaintiff's constitutional rights as a matter of law.

Success on Plaintiff's *Monell* claims require a finding that Plaintiff had a constitutional right to enter and remain inside the perimeter of an active police operation, a location closed to

the general public, for the purpose of gathering information.  Alternatively, it requires that

Plaintiff had a Fourth Amendment right immunizing her from arrest for trespass if the crime was

committed while she was acting as a reporter.  Plaintiff does not have either of these rights.  Her

First Amendment right as applicable to the facts of this case is to "gather news from any source

*by means within the law*."  *Branzburg* 408 U.S. at 682.  When Plaintiff attempted to gather

information by means other than those "within the law", she was subject to arrest like any other

person.

Plaintiff cannot prove that the implementation of any alleged policy or policies resulted it

the violation of her First or Fourth Amendment rights.  She cannot prove her 42 U.S.C. § 1983

claims against the City of Medford as a matter of law.

### C.    Plaintiff Cannot Prove her Supervisory Liability Claims under 42 U.S.C. § 1983

Supervisory liability under 42 U.S.C. § 1983 is imposed against a supervisory official in

their individual capacity for their "own culpable action or inaction in the training, supervision, or

control of [their] subordinates, acquiescence in the constitutional deprivations of which the

complaint is made or conduct that showed a reckless or callous indifference to the rights of

others."  *Starr v. Baca*, 652 F.3d 1202, 1205–06 (9th Cir. 2011), internal citations omitted.

Plaintiff alleges City Defendants Medford,[3] Clauson, Sjothun, Kirkpatrick, Arnold and

Jewell are liable to her under 42 U.S.C. § 1983 for violations of her First and Fourth Amendment

rights based on their failure to "train, supervise, and control officers" who were implementing

the City of Medford's "policy that prevented her from observing and reporting on the events in

Hawthorne Park on September 22, 2020."  Complaint ¶¶ 23-25, 31-33.

As explained above, Plaintiff cannot prove that she suffered a constitutional violation at all.

Without a constitutional violation, Plaintiff's supervisory liability claims under 42 U.S.C. § 1983

also fail as a matter of law.

---

[3] The City of Medford cannot be held liable for the acts of its employees.  A supervisor liability claim cannot be stated against the public body.  *Monell*, 436 U.S. at 694-95.

### D.     All Defendants Are Entitled to Judgment on the 42 U.S.C. § 1983 Claims Based on Qualified Immunity

"Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  A government official is entitled to qualified immunity if "accepting all of Plaintiffs' allegations as true, the defendant's conduct '(1) violated a constitutional right that (2) was clearly established at the time of the violation.'"  *Polanco v. Diaz*, 76 F.4th 918, 925 (9th Cir. 2023) (*quoting Ballou v. McElvain*, 29 F.4th 413, 421 (9th Cir. 2022)). "For a right to be clearly established, it must be 'sufficiently clear that every reasonable official would understand that what he is doing violates that right.'"  *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023) (*quoting Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (per curiam)).  A court, in its discretion, may address the prongs in any order.  *Pearson v. Callahan*, 555 U.S. 223 (2009).

Starting with the first prong, this Court must determine whether Plaintiff's allegations, if true, establish that the City Defendants violated her constitutional rights.  As noted, Plaintiff has alleged in her complaint that her arrest and removal from Hawthorne Park violated both her First and Fourth Amendment rights.  Complaint ¶¶ 21, 29.  In her deposition, Plaintiff confirmed that it was the exclusion from Hawthorne Park and the subsequent arrest when she refused law enforcement's order to leave the park that she believes violated her constitutional rights.  She testified:

> Q.     Okay. So I just want to be like completely clear. So you're now aware that the park was closed, but is it your testimony that you believe you had a right to be in there anyway?
>
> A.     Yes.
>
> Q.     Okay. And -- okay. And you're basing that off of what?
>
> A.     My First Amendment right.

Fonseca Depo 122:21-123:3

> Q.     Okay. Can you just describe, in your own words for me, any ways that Anna Stokes interfered with your freedom of the press?
>
> A.     She interfered with my freedom of the press by arresting me.

* * *

Q.    Okay. And is that the way in which, in your mind, all of these officers interfered with your freedom of the press?

A.    Yes.

Q.    Just by placing you under arrest?

A.    Yes.

Fonseca Depo 112:18-22; 113:1-6.

As is explained above, Plaintiff did not have a First Amendment right to enter and remain in Hawthorne Park for the purpose of news gathering when the park was closed to the public. Having no protected right to remain in the park, Plaintiff had no Fourth Amendment right not to be arrested for trespass when refusing to leave the park. The lack of a constitutional violation entitles all City Defendants to qualified immunity.

Turning to the second prong of the qualified immunity analysis, even if it were assumed that Plaintiff had a First Amendment right to enter a closed park during an emergency police operation for the purpose of gathering information about police activity (and a corresponding Fourth Amendment right not to be arrested for that conduct), that right was not clearly established in September 2020. Plaintiff cannot point to a single case in which a court has held that a reporter has the First Amendment protection she is claiming here. To the contrary, the case law unanimously holds that a reporter has no greater right of access to locations or information than does the general public. The lack of any reported case law supporting Plaintiff's position requires a finding that the City Defendants are entitled to qualified immunity. As the Ninth Circuit stated in *Rico v. Ducart*, 980 F.3d 1292 (9th Cir. 2020): "[w]hile we do not require a case on all fours to overcome qualified immunity, 'existing precedent must have placed the constitutional question beyond debate.'" *Id.,* at 1298, *quoting Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Plaintiff is seeking recognition of a First Amendment right to gather news that is greater than that enjoyed by the general public. She can identify no precedent affording a reporter such

a right.  Thus, even if this Court determines such a right exists, that right was not clearly established at the time of Plaintiff's arrest for purposes of avoiding qualified immunity.

### E.    Plaintiff Cannot Establish the Elements of a State Law Claim of False Arrest

Plaintiff's seventh claim is for false arrest.  A false arrest claim consists of four elements: (1) the defendant must confine the plaintiff; (2) the defendant must intend the act that causes confinement; (3) the plaintiff must be aware of the confinement; and (4) the confinement must be unlawful.  *Miller v. Columbia Cnty.*, 282 Or. App. 348, 353–54 (2016).  Plaintiff cannot establish the fourth element as a matter of law.

Plaintiff admits that she refused to leave Hawthorne Park when she was ordered to do so.  She was unlawfully remaining in Hawthorne Park.  Her arrest and subsequent confinement were supported by probable cause and thus were lawful.  Arnold Dec., Ex. 12.

### F.    Plaintiff Cannot Establish a Claim for Battery

A "battery" is a "voluntary act that is intended to cause the resulting harmful or offensive contact."  *Walthers v. Gossett*, 148 Or. App. 548, 552 (1997).  A police officer is justified under Oregon law in using physical force when he or she believes it is reasonably necessary to make an arrest.  *Gigler v. Klamath Falls*, 21 Or. App. 753, 763 (1975).  A police officer is presumed to be acting in good faith in determining the amount of force necessary to make the arrest.  *Rich v. Cooper*, 234 Or. 300, 309 (1963).  However, the use of excessive force by a police officer in carrying out an arrest can give rise to civil liability for battery.  *Ballard v. City of Albany*, 221 Or. App. 630, 640–41 (2008).

As noted, Plaintiff has not asserted a claim of excessive force against the City Defendants.  She simply identifies the touching that occurred during the course of taking her into custody and claims it was a battery because the arrest itself was unlawful (because she was acting as a reporter.).  Complaint ¶ 38.  Justification is a complete defense to Plaintiff's battery claim if the court finds that her arrest was lawful.  *Rich,* 234 Or. at 309.

V.     **CONCLUSION**

For the foregoing reasons, each of the City Defendants is entitled to summary judgment dismissing Plaintiff's claims against them.

DATED this 28th day of June, 2024.

HUTCHINSON COX


By:    s/Andrea D. Coit
Andrea D. Coit, OSB #002640
Emily M. Perkins, OSB #222553
Of Attorneys for Defendant City of Medford
Scott Clauson, Brian Sjothun, James Barringer,
Steven Furst, Michael Todd, Geoffrey Kirkpatrick,
Randal Jewell, and Trevor Arnold

## CERTIFICATE OF SERVICE

I certify that on June 28, 2024, I served or caused to be served a true and complete copy of the foregoing **CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** on the party or parties listed below as follows:

☒  Via the Court's Efiling System

☐  Via First-Class Mail, Postage Prepaid

☐  Via Email

☐  Via Personal Delivery

☐  Via Facsimile

| | |
|---|---|
| Gregory Kafoury | Johan Pietila |
| kafoury@kafourymcdougal.com | pietiljr@jacksoncountyor.gov |
| Mark McDougal | Madison T. Simmons |
| mcdougal@kafourymcdougal.com | simmonmt@jacksoncountyor.gov |
| Jason Kafoury | Jackson County Counsel |
| jkafoury@kafourymcdougal.com | 10 S. Oakdale Avenue, Rm 214 |
| Kafoury & McDougal | Medford, OR 97501 |
| 411 SW Second Avenue, Suite 200 | Of Attorneys for Defendants Jackson |
| Portland, OR 97204 | County and Anna Stokes |
| Of Attorneys for Plaintiff | |

HUTCHINSON COX

By:   s/Andrea D. Coit
        Andrea D. Coit, OSB #002640
        Emily M. Perkins, OSB #222553
        Of Attorneys for Defendant City of Medford
        Scott Clauson, Brian Sjothun, James Barringer,
        Steven Furst, Michael Todd, Geoffrey Kirkpatrick,
        Randal Jewell, and Trevor Arnold