IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

APRIL FONSECA,

       Plaintiff,

    v.

CITY OF MEDFORD et al.,

       Defendants.

Case No. 1:22-cv-01416-CL

**OPINION AND ORDER**

---

**CLARKE**, Magistrate Judge.

Plaintiff, a journalist with Jefferson Public Radio, brings this action against Defendants City of Medford, James Barringer, Scott Clauson, Brian Sjothun, Steven Furst, Geoffrey Kirkpatrick, Michael Todd, Randal Jewell, and Trevor Arnold (collectively, "Defendants") for claims arising out of her arrest while reporting on the police clearance of an encampment in Hawthorne Park. Before the Court is Defendants' motion for summary judgment, ECF No. 65. The Court held oral argument on December 4, 2024. All parties consent to jurisdiction by a U.S. Magistrate Judge. ECF No. 63. For the reasons below, the motion is DENIED.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving

party has the initial burden of showing that no genuine issue of fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (*en banc*). The court cannot weigh the evidence or determine the truth; it may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## BACKGROUND

Plaintiff April Fonseca is a journalist who, at all times mentioned herein, worked as a reporter for Jefferson Public Radio. Compl. ¶ 3. Scott Clauson, James Barringer, Steven Furst, Michael Todd, Geoffrey Kirkpatrick, Randal Jewell, and Trevor Arnold were police officers in the Medford Police Department. *Id.* ¶ 4. Defendant Kirkpatrick was the sergeant in charge of the Medford Police Department livability section. *Id.* Brian Sjothun was the City Manager of the City of Medford. *Id.* ¶ 5.

In September 2020, Plaintiff was reporting on the Hawthorne Park encampment, a cluster of campers in downtown Medford that sprung up the week of September 10, 2020, after the Alameda fire. Kafoury Dec., Ex. 8: Fonseca 33-36, 38. The encampment provoked public

attention and controversy. Kafoury Dec., Ex. 8: Fonseca 43; Ex. 25: Sjothun, 35. Citing

complaints from citizens concerned about open drug use, property destruction, human waste, and

violence, the Medford City Council, the Medford Chief of Police, the City Manager, Defendant

Trevor Arnold and other members of the Livability Team decided that the people camping in

Hawthorne Park and their campsites needed to be removed. Arnold Dec., ¶¶ 4, 6.

At the time, Defendant Trevor Arnold was the Lieutenant of the Community Engagement

Division for the Medford Police Department. Arnold Dec., ¶ 6. The Community Engagement

Division is a section of the police department that covers the department's code enforcement

division, livability team, the school resource program, the community service officer program,

traffic, volunteers and cultural outreach. *Id.* As such, Defendant Arnold was tasked with the job

of removing the campers from Hawthorne Park and making it safe and available for the City's

parks department to clean. *Id.* He was also the point person for media relations regarding the

City's plan for vacating the campers from Hawthorne Park. *Id.*

On September 18, 2020, City Manager Sjothun issued an order pursuant to City of

Medford City Charter § 18(3)(e) for the closure of Hawthorne Park in Medford, Oregon, for 48

hours, commencing on September 21, 2020, at 8:00 a.m. Complaint ¶ 10; Arnold Dec., ¶ 7, Ex.

3. The order closing Hawthorne Park stated that the park would be closed for forty-eight hours

"to allow for sanitation, cleaning, and inspection of City property." Kafoury Dec., Ex. 11. An

Operation Plan was issued by the City of Medford for the removal of campsites and campers

from Hawthorne Park and for its cleanup. Arnold Dec., ¶ 9, Ex. 5. Defendant Arnold was

identified in the Operation Plan as the Incident Commander for that operation. *Id.*; Complaint ¶

11.

Defendant Jewell drafted an operation plan for the park clearance, which Defendant Arnold approved. Kafoury Dec., Ex. 26: Jewell, 44. Although not stated in the Operation Plan, Defendants planned to exclude reporters and observers from the park during the clearance. Kafoury Dec., Ex. 13; Ex. 23: Arnold 34-35. Chief of Police Clauson was aware of and approved these plans. *See* Kafoury Dec., Ex. 24: Arnold 28. Defendant Arnold testified he selected a "media staging area" outside the park, where police would direct reporters. Kafoury Dec., Ex. 24: Arnold 12-15. He spent approximately two minutes selecting the media staging area. Kafoury Dec., Ex. 24: Arnold 24-25. Reporters and observers could also stand on the sidewalks outside the park. Kafoury Dec., Ex. 24: Arnold 13. Reporters could not hear or record police activity and interactions in Hawthorne Park from these locations. Neumann Dec., ¶¶ 9-10.

A formal notice to vacate Hawthorne Park was posted before 8:00 a.m. on September 21, 2020, alerting the campers that they had 24 hours to vacate or face arrest for trespass. Arnold Dec., ¶ 10. Although the park had not yet been cleaned, and most of the campers remained in the park, the park was open to the public on September 21, 2020. Arnold Dec., ¶11. Reporters conducted interviews in the park while police and social service agencies had a resource fair for campers. *Id.*

The morning of September 22, 2020, Defendants Jewell and Arnold gave an operational briefing to the police officers assigned to clear the park, with Chief Clauson in attendance. Kafoury Dec., Ex. 26: Jewell, 55-56, Ex. 24: Arnold 36-38, Ex. 22: Clausen 37. While the operation plan made no mention of a media staging area, police officers were told that journalists could not enter the park and instead should be sent to the staging area. Kafoury Dec., Ex. 13; Arnold Dec., ¶ 18.

Medford police officers were told at the briefing that anyone who was helping the campers pack and move, not just city employees and resource agency representatives, could remain in the park. Officers were given discretion to refrain from arresting people even after they were told to leave the park. Kafoury Dec., Ex. 24: Arnold 68. Throughout the clearance, which lasted several hours, Defendants excluded reporters and observers while allowing other civilians to remain. Arnold Dec., ¶16-18.

Plaintiff arrived at Hawthorne Park early on the morning of the clearance, carrying her reporting equipment and wearing her press credentials, to report on police actions in the park. She was in the park for a couple of hours before police arrived, without incident. After the police arrived, Plaintiff claims she reported from the parking lot and the interior of the park without disrupting police interactions with campers and volunteers. Kafoury Dec., Ex 8: Fonseca 55-58, 60, 62.

After attending the briefing, Officer Furst also arrived at Hawthorne Park. Although there were numerous campers and volunteers in the park, Defendant Furst focused his attention on confronting and evicting reporters and observers. When Defendant Furst confronted Plaintiff and told her to leave the park, she explained she was a reporter. When she refused to leave the park, Defendant Furst grabbed her arm and told her she was under arrest. Compl. ¶ 16. Three other officers, Defendants Stokes,[1] Todd, and Barringer, joined in subduing and handcuffing Plaintiff. *Id.* Defendants Kirkpatrick and Jewell helped form a perimeter around the arresting officers as they handcuffed Plaintiff.

Defendant Jewell arrested Plaintiff and had her booked into the Jackson County Jail where she was strip search and body cavity searched. Kafoury Dec., Ex. 8: Fonseca 124-125; Ex.

---

[1] Defendant Stokes has been dismissed from this case. ECF #83.

27: Furst, 77; Ex. 29: Kennedy, 21. Officers Barringer and Todd seized and searched Plaintiff's reporting equipment. Compl. ¶ 17.

## PROCEDURAL BACKGROUND

Plaintiff was originally charged with Trespassing, Resisting Arrest, and Interference with An Officer. She pled not guilty. After the City dismissed the Interference charge, Plaintiff filed a Motion to Dismiss the trespassing charge on First Amendment grounds. The Reporters' Committee for Freedom of the Press filed a letter brief in support of Plaintiff's Motion to Dismiss. The municipal court granted Plaintiff's motion and dismissed the trespass charge. The City then dismissed the resisting arrest charge, and Plaintiff filed suit. Kafoury Dec., Ex. 15, 16, 17, and 18.

Plaintiff filed this lawsuit on September 20, 2022, alleging federal civil rights claims and state tort claims. ECF No. 1.

Defendants Jackson County and Anna Stokes were dismissed from this action on September 13, 2024. *See* ECF No. 83.

The Complaint alleges § 1983 claims for violations of the First, Fourth, and Fourteenth Amendments, as well as a state law claim for false arrest and battery. ECF No. 1. Defendants move for summary judgment on Plaintiff's claims for First Amendment violations, Fourth Amendment violations, *Monell* liability, supervisory liability, state law battery, and state law false arrest. ECF No. 65. As to all the constitutional claims, Defendants also move for qualified immunity. *Id.*

//

//

//

## DISCUSSION

**I.    Defendants' motion for summary judgment on Plaintiff's claims for First Amendment violations is denied.**

Plaintiff has raised a question of fact as to whether Defendants violated her First Amendment rights. The First Amendment protects the right to observe and record, just as it protects the right to publish information. *See Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061-62 (9th Cir. 2010) (holding that process of creating pure speech is entitled to the same First Amendment protection as the product of that process). Specifically, the First Amendment protects the right to observe and record police activity in a public place. *Askins v. Dep't of Homeland Sec.*, 899 F.3d 1035, 1044 (9th Cir. 2018). The First Amendment also protects audio and visual recording as expressive activities in their own rights. *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203–04 (9th Cir. 2018). First Amendment protections are at their strongest in a city park, a traditional public forum where the government's rights to restrict speech are "sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). "Excluding the media from public fora can have particularly deleterious effects on the public interest, given journalists' role as 'surrogates for the public,'" *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 830 (9th Cir. 2020) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572–73 (1980)).

Here, Plaintiff was observing and recording police clearing a homeless encampment in a public park. Plaintiff's intent was to report on the clearance. The First Amendment protects both the process of creating speech – observing and recording – as well as the product of that process – reporting. Further, a public park is considered a traditional public forum where such protections are at their strongest. Thus, Plaintiff has raised an issue of fact as to whether Defendants have violated her First Amendment rights.

Plaintiff's actions were protected by the First Amendment, therefore Defendants "bear . . .
the burden of proving the constitutionality of [their] actions." *U.S. v. Playboy Entertainment
Group Inc.*, 529 US 803, 816 (2000). Because Defendants were not targeting any particular
subject of speech, the restriction at issue here is content-neutral. Content-neutral restriction of
First Amendment protected activity in a public forum must be (1) narrowly tailored to serve a
significant government interest and (2) leave open ample alternative channels for
communication, sometimes known as the "reasonable time, place, and manner" test. *Askins*, 899
F.3d at 1044. To apply this standard, there are underlying factual disputes that only a jury can
resolve.

**A. A reasonable juror could find that excluding reporters and observers from the
park during the clearance was not a narrowly tailored restriction to serve a
significant government interest.**

Content-neutral restriction of speech must be narrowly tailored to serve a significant
government interest. *Id.* Here, Defendants must prove that relegating reporters and observers to a
police designated media staging area outside the park and to the park perimeter sidewalk served
a significant government interest.

Recording police officers does not interfere with officers' functions or pose a safety risk.
*See, e.g., Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) ("peaceful recording of an arrest in a
public space that does not interfere with the police officers' performance of their duties is not
reasonably subject to limitation"); *Arizona Broadcasters Ass'n v. Brnovich*, 626 F. Supp. 3d 1102,
1106 (D. Ariz. 2022) (granting a preliminary injunction against a law forbidding video recording
of law enforcement activity within eight feet when directed to stop recording, holding that "the
Court fails to see how the presence of a person recording a video near an officer interferes with
the officer's activities"). Anticipation that an event might become "volatile" or violent does not
weaken or eliminate First Amendment protections. "[T]he proper response to potential and actual

violence is for the government to ensure an adequate police presence . . . and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Index Newspapers LLC*, 977 F.3d at 834 (brackets in original) (quoting *Collins v. Jordan*, 110 F.3d 1363, 1373 (9th Cir. 1996)). Additionally, the Ninth Circuit has found "dispersing the press [is] not essential to protecting the government's interests" during protests. *Id.* at 831.

Defendants argue they excluded reporters and observers for safety reasons, fearing that the clearance could be volatile and that the damage to the park posed a general threat to health and safety. However, the closure order relied only on the need "to allow for sanitation, cleaning, and inspection of City property." Likewise, the operations plan authored by Defendants Jewell and Arnold cites "an increase of littering, drug use, and other unlawful behavior." Dec. of Kafoury, Ex. 13. Defendants have presented no evidence of any critical health or safety concerns justifying the wholesale exclusion of reporters and observers. If a volatile situation were to arise, Defendants had alternative means to respond, including the power to arrest people for interfering with an officer or committing other crimes, without excluding reporters and observers from the park. *See, e.g.*, *Martinez v. City of Fresno*, No. 1:22-cv-00307-DAD-SAB, 2022 WL 1645549, at *11 (E.D. Cal. May 24, 2022).

Defendants point to Hawthorne Park Calls for Service (Kafoury Dec., Ex. 19) to demonstrate that the park had become unsafe after campers arrived. The call log compares the calls for police assistance to Hawthorne Park between August 10th and 21st, 2020 (before the encampment) with calls between September 10th and 21st, 2020 (during the encampment). The number of assault calls in each time frame was the same: one. In the period before campers arrived, there was one call for harassment, two for menacing, and one for weapons law. After

campers arrived there were no calls for these subjects. Thus, it is unlikely that the park had become more dangerous following the influx of new campers.

Additionally, the day before the clearance, when the park was not cleared or cleaned, campers, volunteers, and social service agency representatives were present within the park, as well as journalists conducting interviews. The following day, during the clearance, volunteers helping to clean were allowed to remain in the park, while police excluded reporters and observers. Defendants produced no evidence that any of the arrests made in the park that day were initiated for violent offenses. Presumably, if the park was safe enough for volunteers, there is no reason to believe it was unsafe for journalists. The fact that journalists would have been permitted in the park had they been acting in a volunteer rather than professional capacity suggests the restriction was not narrowly tailored to serve a significant government interest.

Furthermore, Defendants have not offered any evidence that allowing reporters and observers in the park during the clearance posed any threat to the safety of anyone in the park. During the brief time Plaintiff could report from the park on September 22, 2020, after police arrived, she did not endanger anyone's safety or interfere with police activity. None of the officers who participated in her arrest identified anything about Plaintiff's behavior that was dangerous or substantially disruptive. Kafoury Dec., Ex. 14, Ex. 27: Furst, 41 – 43.

Finally, statements made by officers at the park raise a question of fact as to whether health and safety concerns were the real reason reporters were excluded from the park. The day before the park closure, Defendant Jewell was recorded saying to Defendant Kirkpatrick, "the benefit of tomorrow is the park is closed. So, they don't have to follow us around . . . recording us all the time." Kafoury Dec., Ex: 5 p. 2 (cleaned up). It is arguable that Defendant Jewell was referring to the exclusion of reporters and observers in this statement.

Based on the above facts, a reasonable juror could find that the exclusion of reporters and observers from the park was not a narrowly tailored restriction to serve the goal of public safety, but rather a targeted attempt to prevent reporting on the clearance.

### B. A reasonable juror could find that excluding reporters and observers from the park during the clearance did not leave open ample alternative channels for communication.

Plaintiff could not successfully observe and report on police activity from the sidewalks and media staging area outside Hawthorne Park. "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014).

Here, although Defendants did provide a space for reporters to use as a "media staging area," it served its purpose only in name. Reporters and observers could not see, hear, or record interactions between and among law enforcement and people in the park from the staging area or the sidewalks outside the park. The staging area was approximately 208 feet from the center of the park encampment, while the perimeter sidewalks were as much as 257 feet from the center of the encampment. The park was 700,932 square feet, and video shows trees and buildings in the park. Traffic noise from the I-5 overpass and surface streets made it more difficult to hear what was happening within the park. Neumann Dec., ¶ 9.

Defendants claim that the staging area location was selected in part so reporters could interview people leaving the park. Arnold Dec., ¶ 19. The ability to interview people after they left the park did not cure the City's decision to prevent reporting on and observing police activity within the park. *See, e.g. Martinez*, 2022 WL 1645549, at *11 (ability to interview homeless campers did not cure ordinance's restriction on witnessing government agents' clearance of

homeless encampments). Additionally, Plaintiff, as a radio reporter, could not record conversations and sounds within the park from outside the park. Neumann Dec., ¶ 10, 11.

The evidence that reporters could not hear, see, record and report on police activity creates a factual dispute a jury must resolve to determine whether these restrictions left open ample means of observation and communication. *See Reed v. Lieurance*, 863 F.3d 1196, 1212 (9th Cir. 2017) (court could not conclude as a matter of law that alternative observation opportunities were "ample").

### C. Defendants' reliance on cases involving accidents, crime scenes, and venues where access can be limited does not resolve the issues in this case; Plaintiff also had a qualified right of access to Hawthorne Park to observe and report on the clearance.

Defendants rely on two lines of cases to argue Plaintiff had no First Amendment right to observe and report on police activity from Hawthorne Park during the clearance: cases holding reporters do not have the right of access to accidents, disasters, and places closed to the public, and cases holding that in contexts where the government can limit public access, reporters' rights are no greater than the public's. Neither resolves the issues in this case.

*i.    Not every police operation is an emergency, accident, or disaster.*

It is not disputed that the Hawthorne Park clearance was "a police operation," but not every police operation is an emergency, accident, or disaster warranting closure, and there is no First Amendment exception for "police operations." *See, e.g., Index Newspapers LLC*, 977 F.3d at 838 (upholding preliminary injunction exempting reporters and legal observers from law enforcement dispersal orders during protests). The Hawthorne Park clearance was not a car accident or a fire. It was a scheduled, announced event that took place over several hours, with multiple civilians allowed to enter and remain in the park, while city employees and social

service agency representatives came and went. Whether this operation qualifies as a situation requiring a First Amendment exception is a question for the jury to resolve.

Defendant Arnold, the park clearance incident commander, testified he believed the clearance was an emergency and thus the police could bar media from the park pursuant to the City's Media Access policy. Arnold Dec., ¶ 12. However, he acknowledged that the policy manual contained no definition of emergency. Rather, "it would be up to the supervisor, the watch commander, the officer in charge of any particular incident and basically deeming it an emergency, if there is any to threat a life or safety or property or potential injury. So it's very broad and very subjective from case to case." Kafoury Dec., Ex. 24: Arnold 51.

Defendants now define an "emergency operation" allowing the police to exclude the press as any "organized responses to specific incidents that do or have the potential to threaten health, safety or property." Kafoury Dec., Ex. 31 p.16. This vague and overbroad definition does not provide sufficient guidance on when Defendants can prevent media from observing law enforcement. Virtually any police activity would qualify as an emergency; indeed, Defendant Arnold stated that emergencies included "pretty much every call for service we go to." Kafoury Dec., Ex. 24: Arnold 64. The First Amendment requires that restrictions on the media be narrowly tailored; these definitions of "emergency" are not.

Finally, the cases that Defendants cite to bolster their argument do not apply here. For example, in *Belsito v. Decker*, 845 F.3d 13 (1st Cir. 2016), the First Circuit considered the right of a freelance photographer impersonating as a first responder to photograph the extraction of a corpse from a car in a closed accident scene. The photographer drove a repurposed ambulance, used "wig wag lights," and wore a fireman's helmet and turnout coat. *Id.* at 18. The court explicitly declined to rule on the photographer's First Amendment claim, or to "say what a

complete compendium of First Amendment rights for news gathers [sic] is or should be." *Id.* at 28. Rather, the court found that for purposes of qualified immunity, a First Amendment right to impersonate a first responder and enter a restricted accident scene to take photographs was not clearly established in 2010. *Id.*

Similarly, *Chavez v. City of Oakland*, No. C 08-04015 CRB, 2009 WL 1537875 (N.D. Cal. June 2, 2009), aff'd, 414 Fed. Appx. 939 (9th Cir. 2011), held that a newspaper photographer had no right to park his car on the freeway, impeding rescue vehicle access, and then stand on the freeway taking photographs of an accident, when there was no evidence the public had such a right or were also standing in the freeway taking photos.

Here, unlike in the cases cited above, Plaintiff's actions did not interfere with the ability of the police to do their job. Plaintiff did not don a disguise or impede the operation, and, in fact, if Plaintiff had simply been acting as a civilian volunteer she would have been allowed to enter the restricted access area. At the very least, the question of whether the police operation in Hawthorne Park qualifies as an emergency is one for the jury to resolve.

*ii.     Reporters have a qualified right of access to government proceedings.*

Reporters and members of the public have a First Amendment qualified right of access to government proceedings when (1) "the place and process have historically been open to the press and general public," and (2) "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise Co. v. Superior Court of California for Riverside Cty.*, 478 US 1, 8 (1986). Taken together, these two elements make up the qualified right of access to government proceedings test. If the court finds a qualified right of access exists, the government can overcome that right and bar the public only by demonstrating that it

has "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* at 9.

This case is like *California First Amend. Coal. v. Woodford*, 299 F.3d 868 (9th Cir. 2002). There, the Ninth Circuit held that the press and public had a First Amendment right to view an execution from start to finish. *Id.* at 885-86. The decision upheld the district court's finding that the prison's restrictions on reporters and witnesses were "an exaggerated response to defendants' concerns about the safety of prison personnel," motivated in part by their "interest in avoiding any public perception that executions involve the use of excessive force." *Id.* at 880, 883. The court found that the prison's limits on viewing executions "prevent[ed] the public from having any first-hand knowledge of the events" and would force the public to rely on the prison officials who carried out the execution for information. *Id.* at 883. Later, the Ninth Circuit also held that "the First Amendment right of access to governmental proceedings encompasses a right to hear the sounds of executions in their entirety." *First Amend. Coal. of Ariz., Inc. v. Ryan*, 938 F.3d 1069, 1075 (9th Cir. 2019).

Just as there is a First Amendment right of access for the public and reporters to see and hear an execution, a jury could find there is a right to see and hear police as they clear a homeless encampment in a public park. *See, e.g. Martinez,* 2022 WL 1645549, at *11. Just as the prison's averred security concerns were outweighed by that right, a jury could find reporters' and observers' rights outweigh Defendants' purported health and safety concerns. *See, e.g., Index Newspapers LLC*, 977 F.3d at 838. A jury must resolve the factual disputes to determine if Plaintiff is protected by the qualified right of access to government proceedings. Defendants' motion for summary judgment on Plaintiff's First Amendment claims is denied.

II.    **Defendants' motion for summary judgment on Plaintiff's claims for Fourth Amendment violations is denied.**

A question of fact exists as to whether Plaintiff's seizure through arrest was lawful, and the subsequent search of her person and belongings made incident to her arrest was within the bounds of the Fourth Amendment.

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. *Davis v. United States*, 564 U.S. 229, 230-31 (2011). An arrest supported by probable cause is reasonable under the Fourth Amendment as a matter of law. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964) (Holding that probable cause to arrest exists when the facts and circumstances within an officer's knowledge and of which he or she had reasonably trustworthy information were sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense.). However, "one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution." *Wright v. Georgia*, 373 U.S. 284, 291–92 (1963).

Defendants argue that probable cause for arrest existed when Plaintiff refused law enforcement's command to leave the park. However, the exclusion of Plaintiff from the park in the first place raises a question of fact regarding the potential violation of her First Amendment rights. Thus, while Plaintiff did refuse law enforcement's command to leave the park, the command itself was potentially violative of the Constitution. If this is the case, the resulting arrest was unlawful, and the incident search was beyond the bounds of the Fourth Amendment. This factual inquiry is one for the jury to resolve, and Defendants' motion for summary judgment is denied.

//

**III.    Defendants' motion for summary judgment on Plaintiff's *Monell* claim is denied.**

"... [T]o establish municipal liability, a plaintiff must show that a 'policy or custom' led to the plaintiff's injury." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016) (en banc) (quoting *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978)). A municipality can also be found liable for policies of inaction, including failures to supervise and train, when the policy (1) "amounts to deliberate indifference to the plaintiff's constitutional right[s]" and (2) "caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy." *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012). Thus, although Defendants correctly state that the City of Medford cannot be held liable for its employees' actions by virtue of respondeat superior liability, the City can be liable for a failure to supervise and train employees that resulted in a constitutional violation. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–91 (1989); *Garmon v. Cty. of Los Angeles*, 828 F.3d 837, 846 (9th Cir. 2016).

Plaintiff has raised a question of fact as to whether Defendants violated her constitutional rights. The City disputes that it had "an official policy" that led to the violation of Plaintiff's First and Fourth Amendment rights. However, the City acknowledges that it relied upon the City of Medford News Media Relations Policy, Policy No. 346, which applied to the City of Medford Police Department. The Media Access portion of this policy, News Media Relations 346.3, allowed police to prevent reporters from "interfering with emergency operations and criminal investigations." The City used this policy to justify excluding reporters from Hawthorne Park on September 22, 2020. As discussed, the policy did not define the term "emergency," and the City's interpretation of the term allowed police officers to exclude reporters and observers from any police operation without First Amendment constraints on their actions.

In this case, Plaintiff has submitted plenty of evidence to support the allegation that the City's policies and official decisions pursuant to these policies led directly to city employees' violation of Plaintiff's First and Fourth Amendment rights. Defendants' motion for summary judgment is denied.

## IV.    Defendants' motion for summary judgment on Plaintiff's supervisory liability claims is denied.

"A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011) (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)). The requisite causal connection to establish supervisory liability can be established by "setting in motion a series of acts by others" or "knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr* 652 F.3d at 1207-08 (cleaned up). "Questions of causation often involve factual disputes, which cannot be resolved by the court on a motion to dismiss or even on a motion for summary judgment." *Estate of Gonzales v. Hickman*, No. ED CV 05-00660 MMM (RCx), 2006 WL 4959780, at *16 (C.D. Cal. Jan. 30, 2006).

In this case, Defendants Sjothun, the City Manager, Kirkpatrick, the sergeant in charge of the Medford Police Department livability section, Clausen, the Chief of Police, Arnold, the incident commander, and Jewell, the incident supervisor, were all sufficiently involved in the Hawthorne Park closure that a reasonable juror could find the casual connection necessary to establish supervisory liability. Their titles alone suggest these Defendants played supervisory roles in the park closure.

More specifically, Defendant Sjothun issued the blanket order closing the park, based on discussions with Police Chief Clausen and others. Defendants Arnold and Jewell drafted the operations plan for the clearance, and Defendant Arnold designated the media staging area based on Defendant Sjothun's order closing the park and the City's Media Access Policy. Defendant Clauson approved the operations plan, including the plan to exclude reporters and observers, and the designation of the media staging area. Defendants Arnold and Jewell gave the operations briefing, which Defendant Clauson attended. Defendants Kirkpatrick and Jewell helped form a perimeter around the arresting officers as they handcuffed Plaintiff.

There are factual disputes for a jury to decide regarding the causal connections necessary to establish supervisory liability. Additionally, Plaintiff has raised a question of fact as to whether Defendants violated her constitutional rights. Thus, Defendants' motion for summary judgment on the issue of supervisory liability is denied.

## V.  Defendants' motion for summary judgment on the grounds of qualified immunity is denied.

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). A government official is not entitled to qualified immunity if, accepting all of Plaintiff's allegations as true, Defendants' conduct "(1) violated a constitutional right that (2) was clearly established at the time of the violation." *Polanco v. Diaz*, 76 F.4th 918, 925 (9th Cir. 2023) (quoting *Ballou v. McElvain*, 29 F.4th 413, 421 (9th Cir. 2022)). For a right to be clearly established, it must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (per curiam)). "The question is not whether an earlier case mirrors the specific facts here. Rather, the relevant question is whether the state of

the law at the time gives officials fair warning that their conduct is unconstitutional." *Ballentine v. Tucker*, 28 F.4th 54, 66 (9th Cir. 2022) (cleaned up) (quoting *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013)). "Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate." *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003).

The City of Medford claims that Defendants are protected by qualified immunity against Plaintiff's § 1983 claims. The Court disagrees. First, municipalities and individuals sued in their official capacity are not entitled to qualified immunity. *Wright v. Beck*, 981 F.3d 719, 737 (9th Cir. 2020). Second, Plaintiff's constitutional rights were clearly established at the time of the alleged violation, and whether Defendants violated these rights is a question for the jury to decide.

Plaintiff challenges the government's restriction of reporters' and observers' access to a public forum to observe and record police activity. A reporter's right of access, even if qualified, is a right that is clearly established under First Amendment precedent. *See Askins*, 899 F.3d at 1044-47 (setting forth the standards of review for government restrictions on First Amendment activity in the context of photographing government facilities and activity on the border); *Perry Educ. Ass'n*, 460 U.S. at 45 (acknowledging First Amendment protections are at their strongest in a city park, a traditional public forum where the government's rights to restrict speech are "sharply circumscribed"); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing a First Amendment right to film matters of public interest); *California First Amend. Coal.* 299 F.3d at 883-86 (holding that the press has a First Amendment right to view an

execution from start to finish and finding that restrictions on reporters would impermissibly force the public to rely on the prison officials who carried out the execution for information).

Here, Defendants prevented Plaintiff from recording and observing police activity in a city park. The subject of Plaintiff's attempted reporting was the clearance of a homeless encampment, a matter of public interest. The targeted exclusion of reporters as well as the comments made by officers such as, "they don't have to follow us around . . . recording us all the time," may suggest the restrictions were not motivated by legitimate safety concerns, but rather a desire to prevent negative press. Excluding the press from the park would force the public to rely on the officers who carried out the clearance, rather than independent observers, for information. While the specific combination of facts in this case may be unique, the overarching issue is not. The courts have made clear that in cases such as this, a reporter's right of access is protected under the First Amendment.

For the above reasons, Defendants' motion for summary judgment on the issue of qualified immunity is denied.

## VI.    Defendants' motion for summary judgment on Plaintiff's state law battery claims is denied.

Plaintiff's state law claims rest on the same issue of probable cause as her Fourth Amendment claim. Under Oregon law, a "battery" is a "voluntary act that is intended to cause the resulting harmful or offensive contact." *Walthers v. Gossett*, 148 Or. App. 548, 552 (1997). A police officer is justified in using physical force upon another person only when it is objectively reasonable under the totality of the circumstances known to the police officer. O.R.S. § 161.233(1). The police officer must believe either (1) that the person poses an imminent threat of physical injury or (2) that the use of force is necessary to make a lawful arrest or prevent an

escape from custody when the officer has probable cause to suspect the person committed a crime. O.R.S. § 161.233(1)(a)-(b).

Here, there is no evidence to indicate the officers thought Plaintiff posed an imminent threat of physical injury. Thus, for Defendants to be justified in using physical force upon Plaintiff, they must have had probable cause to suspect Plaintiff of committing a crime. As discussed in the Court's analysis of Plaintiff's Fourth Amendment claim above, the issue of probable cause and the legality of the arrest is for the jury to decide. Thus, Defendants' motion is denied.

## VII.    Defendants' motion for summary judgment on Plaintiff's state law false arrest claims is denied.

Defendants argue that Plaintiff cannot establish the elements of a state law claim of false arrest. A false arrest claim consists of four elements: (1) the defendant must confine the plaintiff; (2) the defendant must intend the act that causes confinement; (3) the plaintiff must be aware of the confinement; and (4) the confinement must be unlawful. *Miller v. Columbia Cty.*, 282 Or. App. 348, 353–54 (2016). "In an action for false arrest, the plaintiff has the burden to show the imprisonment. After that, the defendant has the burden of showing that the imprisonment was not unlawful." *Ross v. City of Eugene*, 151 Or. App. 656, 663 (1997).

It is the fourth element – whether the confinement was unlawful – at issue in this case. Plaintiff contends that her arrest violated the First Amendment and was thus unlawful. If the jury agrees, Plaintiff will be able to meet all elements of a state law claim for false arrest. Therefore, Defendants' motion for summary judgment on this claim is denied.

//

//

## CONCLUSION

This case presents important issues for a jury to resolve between law enforcement and the news media, both of whom play critical roles in a democratic society. Police strive to keep our communities safe, while reporters shed needed light on these activities.

Defendants' Motion for Summary Judgement, ECF No. 65, is DENIED.

IT IS SO ORDERED and DATED this _2_ day of April, 2025.

MARK D. CLARKE
United States Magistrate Judge